IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | CRIMINAL NO. 11-143 (RCL) |
| | **UNDER SEAL** |
| v. | |
| | VIOLATIONS: |
| | 18 U.S.C. § 1962(d) |
| | (Conspiracy to Conduct the |
| **FRANCISCO CARBAJAL FLORES,** | Affairs of an Enterprise through |
| also known as "Dalmata" | a Pattern of Racketeering Activity) |
| | |
| | 18 U.S.C. §§ 3, 1114 & 1111 |
| | (Accessory after the Fact for |
| | Murder of an Officer or Employee |
| | of the United States) |
| **Defendant.** | |
| | 18 U.S.C. §§ 3, 1114 & 1113 |
| | (Accessory after the Fact for |
| | Attempted Murder of an Officer |
| | or Employee of the United States) |

**INFORMATION**

The United States Attorney charges that:

**GENERAL ALLEGATIONS**

At all times relevant to this Information:

1. Defendant **FRANCISCO CARBAJAL FLORES, also known as "Dalmata,"** (hereinafter referred to as "defendant **CARBAJAL FLORES**") and others known and unknown, were members and associates of an organization engaged in, among other things, conspiracy to distribute controlled substances, distribution of controlled substances, murder, conspiracy to commit murder, attempted murder, kidnaping, carjacking, and robbery. At all relevant times, this organization, sometimes referred to as the "Los Zetas Cartel" ("the organization"), operated in the

United Mexican States ("Mexico"), the United States and elsewhere.

2. The organization began as an enforcement wing of a Mexican drug trafficking organization, known as the "Gulf Cartel," and emerged in recent years as an independent Mexican criminal organization. Initially comprised of deserters from the Mexican armed forces Special Forces units, it has evolved into a violent, sophisticated, transnational criminal organization with operations spanning throughout Mexico and Central America. The organization controlled much of the organized criminal activity from the state of San Luis Potisi, Mexico to the border town of Nuevo Laredo, Mexico. In addition, the organization controlled hundreds of miles of Mexican territory along the border of Mexico and the United States.

3. The organization was responsible for transporting multi-ton quantities of cocaine and marijuana, on a monthly basis, from Mexico to the United States. It also facilitated the collection, transportation and delivery of narcotics proceeds in bulk quantity from the United States to Mexico.

4. The organization was heavily armed and protected its territory from the Gulf Cartel and other perceived threats through the use of force. The organization recruited its members from Mexico as well as Central America. Its hierarchy mirrored the command structure of the military.

5. The organization divided its territory into regions or states, each of which was controlled by a regional boss. The regions were subdivided into cities or plazas, each of which was controlled by a plaza boss. The plaza boss was responsible for reporting to the regional boss, who in turn was responsible to Zeta-leadership. The plaza boss employed the use of numerous hit squads, known as "estacas." An estaca consisted of three or four armed individuals, known as "sicarios" or hitmen, and was led by a commander or "comandante." The estacas patrolled Los Zetas-controlled territory primarily by vehicle, providing protection and security over its territory and assets,

including its lucrative drug trafficking routes from Mexico to the United States, as well as engaging in criminal activity, including kidnapings, carjackings, human smuggling, and assassinations for the benefit of the organization. The plaza boss also employed the use of numerous lookouts, known as "halcones," to monitor activity within the plaza territory.

6. The organization received and transported cocaine and marijuana shipments via boat, airplane, and motor vehicle from South and Central America to various locations in Mexico.

7. The organization transported shipments of cocaine and marijuana by means of motor vehicle and pedestrian drug courier from Mexico to cities in the United States for distribution within the United States.

8. Defendant **CARBAJAL FLORES**, along with other members of the organization, carried out various acts of violence and intimidation on behalf of the organization and at the direction of its leaders against Mexican law enforcement officers and rival drug cartel members for the purpose of maintaining control over the organization's territory, to include its drug smuggling routes to the United States.

## COUNT 1

(Racketeer Influenced and Corrupt Organizations Conspiracy)

### The Racketeering Enterprise

9. The organization, including its leadership, membership, and associates, constituted an "enterprise," as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact. The enterprise engaged in, and its activities affected, interstate and foreign commerce. The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

## Purposes of the Enterprise

10. The purposes of the enterprise included, but were not limited to, the following:

   a. Profiting and making money for the enterprise and its members and associates by engaging in criminal activity, including, but not limited to, drug distribution, murder, kidnapings, carjackings, robbery, extortion, and human smuggling;

   b. Maintaining and expanding control over the enterprise's territory and assets by engaging in criminal activity, including, but not limited to, that described in paragraph 10.a., bribery and obstruction of justice;

   c. Preserving and protecting the power, territory and profits of the enterprise through the use of violence and threats of violence;

   d. Promoting and enhancing the activities and authority of the enterprise and its members and associates;

   e. Keeping victims, potential victims, and witnesses in fear of the enterprise and in fear of its members and associates through violence and threats of violence;

   f. Providing financial support and information to members of the enterprise, including those who were incarcerated for committing acts of violence, robbery, distribution of controlled substances and other offenses; and

   g. Providing assistance to members of the enterprise who committed crimes for and on behalf of the enterprise in order to hinder, obstruct and prevent law enforcement officers from identifying the offender or offenders,

apprehending the offender or offenders, and prosecuting and punishing the offender or offenders.

### Means and Methods of the Enterprise

11. Among the means and methods by which the defendant and his associates conducted and participated in the conduct of the affairs of the enterprise, included, but were not limited to, the following:

    a. Members of the enterprise and their associates committed, attempted and threatened to commit acts of violence, including murder, extortion, kidnaping, carjacking, and robbery, to protect and expand the criminal operations of the enterprise.

    b. Members of the enterprise and their associates promoted a climate of fear through violence and threats of violence.

    c. Members of the enterprise and their associates used and threatened to use physical violence against various individuals.

    d. Members of the enterprise and their associates engaged in the distribution of controlled substances as a means to generate income.

    e. Members of the enterprise possessed and utilized firearms to prevent competition from rival drug traffickers in and around the geographic area used and controlled by the enterprise, including the protection of lucrative drug trafficking routes from Mexico to the United States.

    f. Members of the enterprise possessed and utilized firearms in order to protect their business of distributing controlled substances.

g. Members of the enterprise possessed and utilized firearms to maintain and advance the goals of the enterprise, including the transportation of narcotics from Mexico to the United States.

### The RICO Conspiracy Charge

12. Beginning on a date unknown, but prior to November 2009, and continuing to the date of this Information, in Mexico, the Southern District of Texas, the Western District of Texas, and elsewhere, defendant **CARBAJAL FLORES,** and others, known and unknown, being a person employed by and associated with the organization described in paragraphs 1 through 8 of the General Allegations, paragraphs 9 through 11 of this Count, and sub-paragraphs (a) through (dd) of the Overt Acts section of this Count, an enterprise engaged in and the activities of which affected interstate and foreign commerce, unlawfully and knowingly combined, conspired, confederated, and agreed together and with each other to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of acts indictable under the following provisions of federal law:

a. Title 18, United States Code, Section 1114 (Murder and Attempted Murder of an Officer or Employee of the United States); and

b. Multiple acts involving the importation and distribution of, and conspiracy to do so, (i) five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, and (ii) 1000 kilograms or more of a mixture and substance containing a detectable amount of marijuana, a Schedule I controlled substance; all in violation of

Title 21, United States Code, Sections 841(a), 841(b)(1)(A), 846, 952, and 960(b)(1)(B) and (G), and 963.

13. It was a further part of the conspiracy that the defendant agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the enterprise.

## OVERT ACTS

14. In furtherance of the conspiracy, and to accomplish the objects of the conspiracy, defendant **CARBAJAL FLORES**, and others known and unknown, committed various overt acts, on or about the following times and dates, including but not limited to, the following:

(a) In or around November 2009, defendant **CARBAJAL FLORES** joined the Los Zetas Cartel as a "halcon" in Ciudad Valles in the state of San Luis Potosi, Mexico.

(b) From in or around November 2009 to February 2010, defendant **CARBAJAL FLORES**, acting as a halcon, communicated to his superiors various locations of suspected rival cartel members and observations of military movement in and around the city of Ciudad Valles, Mexico.

(c) In or around February 2010, defendant **CARBAJAL FLORES** transferred to the city of Valle Rio Verde, Mexico where he continued to work as a halcon.

(d) From in or around February 2010 through March 2010, defendant **CARBAJAL FLORES** conducted surveillance on behalf of the organization of suspected rival cartel members in and around the city of Valle Rio Verde, Mexico.

(e) In or around March 2010, defendant **CARBAJAL FLORES** volunteered to become a sicario for the organization.

(f) In or around March 2010, defendant **CARBAJAL FLORES** was selected by the

organization for training as a sicario.

(g)     In or around May 2010, defendant **CARBAJAL FLORES** attended a Los Zetas sicario school, which included approximately twenty days of military-type training.

(h)     From in or around June 2010 through February 2011, defendant **CARBAJAL FLORES** committed acts of kidnaping, assault, attempted murder, and murder as a means of protecting the criminal activities of the organization, including the protection of lucrative drug distribution routes from Mexico to the United States.

(i)     From in or around May 2010 to June 2010, defendant **CARBAJAL FLORES** and others kidnaped a car dealership owner in Ciudad Valles, Mexico, whom the organization believed was providing financial support to a rival cartel in the form of "taxes" on drug proceeds.

(j)     From in or around May 2010 to June 2010, defendant **CARBAJAL FLORES** and others kidnaped and killed several Mexican police officers they believed supported a rival cartel as punishment, as well as to discourage other officers from doing the same and to intimidate other officers into complying with the demands of the organization.

(k)     From in or around June 2010 to November 2010, defendant **CARBAJAL FLORES** and others conducted numerous kidnapings in and around Rio Verde, Mexico, of individuals whom the Los Zetas believed to be rival cartel members.

(l)     In or about November 2010, defendant **CARBAJAL FLORES** was promoted to an estaca commander by the organization.

(m)     In or around November 2010, defendant **CARBAJAL FLORES**, as an estaca commander, collected taxes from junk yards and drug houses controlled by the organization in Rio Verde, Mexico.

(n) In or around December 2010, defendant **CARBAJAL FLORES** participated in the disposal of the bodies of approximately two or three persons murdered by the organization and believed to be rival gang members.

(o) In or around January 2011, defendant **CARBAJAL FLORES** and others kidnaped a person the organization believed to be a rival cartel member.

(p) In or around January 2011, after taking custody of the kidnap victim described in paragraph 14(o), defendant **CARBAJAL FLORES** and others engaged in an armed confrontation with Mexican authorities.

(q) In or around January 2011, defendant **CARBAJAL FLORES** shot and killed the kidnap victim described in paragraph 14(o).

(r) In or around January 2011, defendant **CARBAJAL FLORES** and others, in an effort to escape from the Mexican authorities after killing the kidnap victim described in paragraph 14(o), forcibly took a Dodge Ram pickup truck.

(s) In or around January 2011, defendant **CARBAJAL FLORES** was assigned to an estaca as a sicario in San Luis Potosi, Mexico.

(t) On or about February 15, 2011, members of the organization attempted to carjack a vehicle, bearing diplomatic plates and occupied by Immigration and Customs Enforcement ("ICE") Special Agents Jamie Zapata and Victor Avila, near San Luis Potosi, Mexico.

(u) On or about February 15, 2011, members of the organization shot and killed ICE Special Agent Jaime Zapata, an officer and employee of the United States, near San Luis Potosi Mexico, while he was engaged in official business.

(v) On or about February 15, 2011, members of the organization shot and wounded ICE

Special Agent Victor Avila, an officer and employee of the United States, near San Luis Potosi, Mexico, while he was engaged in official business.

(w) On or about February 15, 2011, defendant **CARBAJAL FLORES** called his estaca commander requesting permission to report for "estaca duty" following a brief vacation.

(x) On or about February 16, 2011, defendant **CARBAJAL FLORES** told his estaca commander that he was prepared to report for duty upon learning from his estaca commander of his commander's involvement in the shooting of the two ICE special agents.

(y) On or about February 17, 2011 to February 22, 2011, defendant **CARBAJAL FLORES** rejoined his estaca at the instruction of his estaca commander.

(z) On or about February 22, 2011, defendant **CARBAJAL FLORES** and others kidnaped two persons, who were relatives of a person the organization believed had failed to pay taxes to the organization for selling stolen merchandise.

(aa) From on or about February, 22, 2011 to February 23, 2011, defendant **CARBAJAL FLORES** and others held the two kidnap victims described in paragraph 14(z) for ransom and extorted a cash payment in exchange for the release of the two kidnap victims.

(bb) On or about February 23, 2011, defendant **CARBAJAL FLORES** and others possessed weapons, including assault rifles and handguns.

(cc) From on or about February 17, 2011 to February 23, 2011, defendant **CARBAJAL FLORES** protected his estaca commander and other members of his estaca from detection and prosecution from law enforcement for the attack on the two ICE special agents.

(dd) On or about February 23, 2011, defendant **CARBAJAL FLORES** guarded the weapons owned and used by his estaca commander and other members of his estaca.

All in violation of Title 18, United States Code, Section 1962(d).

## COUNT TWO

From on or about February 17, 2011, through on or about February 23, 2011, in Mexico, which is outside the jurisdiction of any particular state or district of the United States, but within the extraterritorial jurisdiction of the United States and, therefore, pursuant to Title 18, United States Code, Section 3238, within the venue of the United States District Court for the District of Columbia, defendant **CARBAJAL FLORES**, and others, known and unknown, was an accessory after the fact to the murder of ICE Special Agent Jaime Zapata, an officer and employee of the United States and agencies in the executive branch of the United States Government, while such officer and employee was engaged in and on account of the performance of his official duties, in that defendant **CARBAJAL FLORES** received, relieved, comforted and assisted the offenders, namely Julian Zapata Espinoza (also known as "Piolin"), Ruben Dario Venegas Rivera (also known as "Catracho"), and Jesus Ivan Quezada Piña (also known as "Loco"), knowing that they had committed that crime by assisting them with intent to hinder and prevent their apprehension, trial and punishment.

**(Accessory After the Fact for Murder of an Officer or Employee of the United States, in violation of Title 18, United States Code, Sections 3, 1114 and 1111)**

## COUNT THREE

From on or about February 17, 2011, through on or about February 23, 2011, in Mexico, which is outside the jurisdiction of any particular state or district of the United States, but within the extraterritorial jurisdiction of the United States and, therefore, pursuant to Title 18, United States Code, Section 3238, within the venue of the United States District Court for the District of

Columbia, defendant **CARBAJAL FLORES**, was an accessory after the fact to the attempted murder of ICE Special Agent Victor Avila, an officer and employee of the United States and agencies in the executive branch of the United States Government, while such officer and employee was engaged in and on account of the performance of his official duties, in that defendant **CARBAJAL FLORES** received, relieved, comforted and assisted the offenders, namely Julian Zapata Espinoza (also known as "Piolin"), Ruben Dario Venegas Rivera (also known as "Catracho"), and Jesus Ivan Quezada Piña (also known as "Loco"), knowing that they had committed that crime by assisting them with intent to hinder and prevent their apprehension, trial and punishment.

(**Accessory After the Fact for Attempted Murder of an Officer or Employee of the United States**, in violation of Title 18, United States Code, Sections 3, 1114 and 1113)

Attorney of the United States in
and for the District of Columbia

Assistant Attorney General, Criminal
Division, U.S. Department of Justice